**UNION CLUB OF PITTSBURGH v.
HEINER, Collector of Internal
Revenue.
No. 6263.**

Circuit Court of Appeals, Third Circuit.
Sept. 14, 1938.

BIGGS, Circuit Judge, dissenting.

———◆———

S. Leo Ruslander and Samuel Kaufman, both of Pittsburgh, Pa., and Morgan S. Kaufman, of New York City, for appellant.

James W. Morris, Asst. Atty. Gen., Sewall Key and Donald J. Marran, of New York City, Special Asst's to Atty. Gen., for appellee.

Before BUFFINGTON, DAVIS, and BIGGS, Circuit Judges.

BUFFINGTON, Circuit Judge.

The basic question in this case is whether The Union Club of Pittsburgh, the taxpayer, was in operation a social club and as such subject to taxation, or was it in operation a business luncheon club and therefore not subject to taxation.

In determining that question the weight of the authorities indicates the test is whether, in its actual working, business was an incident to social or social features incidental to business.

What are the predominant features of The Union Club? Is it social relaxation or business activity, supported and paid for by business companies for business purposes? This was pointed out in Bank-

ers' Club v. United States, Ct.Cl., 37 F.2d 982, where the Court said [page 985]: "The issue is the purpose of the club." And in the Houston Club, Ct.Cl., 58 F.2d 487, where one 'of its chartered purposes was "to promote social intercourse among its members," the Court of Claims, before which many of these club cases come, says: "Though there may be social features incident to its general activities, yet if the social feature is a subordinate and merely incidental feature to the 'predominant' purpose of the organization, it is not a social club. This must be true unless all clubs where people congregate are social clubs, 'because practically all clubs may be said to have a feature of the social, using the term as having to do with human intercourse.'"

Indeed this general principle is recognized by the taxing authorities. Regulation 43, article 35 provides: "The *purpose and activities of a club and not its name determine its character* for the purpose of the tax." And article 36 exempts where "its social features are not a material purpose of the organization, but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as for example religion, the arts, or *business*."

Turning then to the questions involved as above indicated, we find at the outset a business purpose and practice which existed in no other club case, namely, that this was not a club of individuals who sought membership for social purposes, but a club supported·and paid for by business corporations for business purposes. In that regard a vice president of the club testified:

"Q. Was it the custom for business houses to make arrangements for eating in the Club quarters? A. Yes.

"Q. Tell about that. A. If I may say this, the Steel Companies in town and the Banks all had memberships there; and if a Steel executive was moved out to Youngstown or Chicago, they usually transferred that membership *to the man who took his place,* and there were Steel tables there and Bank tables, and so on. The American Bridge· had a table there and Jones and Laughlin had a table there, and the Union National Bank had a table in the corner there—Lloyd Smith and the McCunes—and the only *entertaining, that is, lunch and dinner* entertaining, *that I knew was strictly business.* During the

Group 8 meetings of the Pennsylvania Bankers' Association, the Union National Bank, the First National Bank, the Mellon National Bank and others had luncheons there as their country correspondents and city depositories came in. During sales conferences of the Steel Companies they would have luncheons there or dinners there.

"Q. When you say that these various business houses had tables there, you mean tables which they used regularly at lunch time? A. That is right.

"Q. So that the members of a particular business house would usually *congregate at a particular table?* A. That is right.

"Q. And do you mean also that the various business houses paid for these? A. The business *houses paid for the initiation of their members and paid for their dues.*

"Q. That was the usual custom? A. It was customary. *The Farmers Bank put me in there and paid my initiation and paid my dues* while I was there. After I went to the Union National they *paid my dues while I was there.* The Jones and Laughlin Steel Corporation's men were all put in there by the corporation and their *dues were paid* up to a time when they had some resignations from them on account of they belonged both to the Union and the Duquesne Club and there was a cutting down of club associations.

*   *   *   *   *   *

"Q. If there were no members at the Club after dinner using the facilities, why in the world would the Club go to the expense of keeping open until twelve o'clock? A. Well, because it was a business club and as such you could get a check cashed if you ran out of money in the middle of the night; you could get your railroad tickets; you could have phone calls left, and so on. It was kind of a *business headquarters for you,* and I used it as such and I know a great many others did. I should say that the activity after the supper hour at night *was very negligible.* I have been there at midnight, and I have been there later.

*   *   *   *   *   *   *

"A. *I certainly never went there except for business.* Mine was, shall I say, a selfish membership. I had a certain amount of business to transact, and that was an excellent place to transact it."

In its physical equipment the proofs show it had none of the service usual in a social club—bath rooms, bed rooms, ball room, private dining rooms. It was not shown by the taxing authorities that it had any of the social features usual in social clubs, such as lectures, entertainments, movie equipment, writing, smoking or card rooms, no clothes pressing. It had no entertainment committee, and the sole entertainment in the club quarters was a few New Year's parties which were not furnished by the Club but by individual members. In the lounge there were several small tables for card playing, but these were briefly used at the luncheon hour and indeed they fell into disuse. In that respect the proof was that "about two o'clock there wasn't anybody playing". That "there would be days when the tables were not filled". That "there was no card room and what playing was done was in the lounge, and, as a witness testified, "I never saw a card game a week on an average". Indeed, the card playing was confined to six or eight members and their playing was by sufferance of the Club and was directed to be carried on in a corner of the lounge. In that regard the proof is:

"I can't be positive as to when the card games started that went on for some time during those years, but I can give you the particulars on it. Prior to a few years before the Club closed I had never heard of a card game in the Club, but in the period just mentioned several men, *perhaps six or eight all told,* arranged to set up a card table in one corner or end of the lounge and play bridge after lunch. I observed it from the day it started and to the day it finished, and I observed the men that were there and it was discussed while I was on the Board of Directors as a question whether it ought to be permitted. It was a bridge game and the question was raised whether it fit in with the use for which that lounge was designed and had always been used; so it was discussed in the Board of Directors, and it was decided to say to *these men,* just to ask them to *conduct their game quietly* and off in that corner and there would be nothing more said about it. *Aside from that I have never seen nor heard of a card game in the Club."*

As to the billiard tables, the proof by a member of the Club whose observation covered four years was:

"A. Well, I should say that all during the time I was a member the only activities of the Club aside from the *lunches or dinners—the dinners were very sparsely—* there were very few people there at dinner—but aside from the eating activities, the only other things I ever observed there were the pool and billiard games that went on immediately after lunch, and there was generally one particular group of people that played a game of bridge.

\* \* \* \* \* \* \*

"I can speak from my own observation about the use of the pool and billiard room more than the use of the lounge or card games. I made it almost a regular practice to play a game of billiards myself after lunch. I don't think I had ever played billiards before I went to the Club, but I went there to have my lunch and usually would get through and want to spend a half hour loafing around, and found that was a convenient place to relax and loaf around for half an hour after lunch, and to play a game of billiards was incidental to that. I usually went to lunch about half past twelve or quarter to one and was through say, about half past one and usually left there about two o'clock or somewhere around two o'clock, and when I would leave there *would be a general exodus* about that time from the billiard room and pool room. I think I have been there sometimes after two o'clock, a good many times, and would say there was practically no one there after, say, a *quarter past two or thereabouts.* The people that I played billiards with myself—we always made it a habit to go and play one game of billiards and then leave, and that seemed to be the general use that the billiard room was put to.

"Q. From your observation during those times what would you say as to the number of the members who did not play billiards? A. Oh, *there were a great many more members who did not than who did.* There were six or eight, possibly eight tables there; there would be possibly twenty-five or thirty people playing billiards or pool, and I don't know how many people went there a day to lunch but I should say there were *at least four times that many who didn't play.*

"Q. And would you say it was usually the same group who played pool and billiards? A. Almost always the same group."

Another witness who was employed by a steel company that had a table of its own testified:

"Q. Did you use the Club for any purpose, other than business purposes? A. No; unless you consider taking my wife out to dinner was aside from business.

"Q. Will you state what use was made of the Club generally by the members from your observation during that period? A. It was used, as I say, largely as a lunch club. This billiard and pool that has been talked of was a relaxation that some of the members indulged in after lunch. There was a little card playing at intervals but it was suppressed to a large degree on account of the annoyance it gave people there who did not want to play cards."

There was no breakfast service and no regular dinner was served. One member testified: "When I took dinner there, I was dining in a big barn of a dining room and usually no one else there." Another witness, asked if he did not take his wife there for dinner, testified, "I did for a while, but it became such a morgue that we would go some place else." The testimony of the same witness was:

"Q. Will you state whether or not you used the Club for business purposes or for other purposes? A. Simply for business.

"Q. And what would you say as to the purposes for which the Club was used by the other members from your observation?. A. Well, from my observation it was simply used as a lunch club.

"Q. I mean as between business purposes and other activities. A. Simply business purposes."

The Government called no witnesses to contradict these proofs, so that the testimony of witnesses as to what the Club actually did stands uncontradicted and shows that in operation, in purpose and in service it was a business club, largely financed by business companies for business purposes, and that whatever social elements were used were mere minor elements to the dominant purpose of business and business alone. It is clear that this business club had no elements that would lead a nonbusiness man to join it. Indeed its activities were, per se, confined to business hours and no way to the relaxing hours of social enjoyment.

■■■ It is contended, however, that the charter of the club constituted evidence to

the contrary and that being evidence, the finding of the court cannot be disturbed. We cannot accede to this contention or conclusion. The Pennsylvania Corporation Act provided for incorporation for "the maintenance of a club for social enjoyments." Act Pa. June 25, 1895, P.L. 314, § 2, subd. 6. It made no provision for chartering a dining club, but it is clear from the charter's terms that the applicants for the charter, while making their application, as they did under the generic provision for "a club for social enjoyment", expressly stated that this particular club was to be both a dining and business club. This was reiterated twice in the charter—first, as a dining club, "in particular, encouraging social intercourse among its members by providing dining facilities"; and next as a business club, "a place where its members may meet for the discussion of their social and *business affairs*". It is quite clear that this charter, far from contradicting the testimony of every witness called, that in its actual workings the club turned out to be what may be styled "a business luncheon club," really supported their testimony that it was a business luncheon club. Nor can we see that the prospectus later issued in an effort to secure members constituted contradictory evidence, for while it stated there were social features to the club, yet such social features were merely incidental to the fact and the uncontradicted oral proof that the club was a luncheon club for business purposes. "Among our membership are scores of active and aggressive *young business men,* many of them sons of the original founders, so that we have concrete assurance of the sound prospects of the club in the future." Nor do we find anything contradictory or estopping in the claim for income exemption, for inspection of the claim shows that it stated in exact terms the charter provisions enumerated above, namely "by providing dining facilities, a reading room and place where its members may meet for the discussion of their social and *business affairs.*" Indeed, the prospectus assumes this fact: "Call it a luncheon club if you will—it is more than that". Moreover, that it was a business club originated by business men and to be continued by business men is shown by its appeal to business men and its claim for income exemption was under the Revenue Act which provided for the exemption of "clubs organized and operating exclusively for

pleasure, recreation and *other non-profitable* purposes." Clearly, to hold that the claim was made on the ground that it was a social club is to ignore the fact that it was entitled to exemption under the broad provision "other non-profitable purposes". To so hold is at variance with the cardinal principle of taxation that doubts are to be reserved in favor of the taxpayer. Moreover, it is clear that if this club was in purpose and practice a social club, it could not have existed and it was only because it was supported by business companies for business purposes that it could exist with an annual deficit in five years of thirty-one thousand dollars.

Moreover, bearing in mind the fact that the Club was necessarily, under the Pennsylvania statute, chartered as a social club, this did not prevent the club, in its subsequent operation, functioning as a business club. And it will be observed that in considering the cases the fact that where, as stated in Century Club v. United States, Ct.Cl., 12 F.Supp. 617, the club was originated "to promote social intercourse" [page 619], nevertheless the Court held "the application of the law, however, does not depend so much on what is stated in the articles of association of any club as it does upon its actual operations." The testimony of what the club actually did is proven and no witness is called by the Government, on which the burden rests, to contradict the proof quoted above. Indeed, paraphrasing the language of the Court in Bankers' Club v. United States, Ct.Cl., 37 F.2d 982, the record fails completely to establish that the *continued habit of its membership* and the general and established conduct of its management indicate any other purpose than to set up and maintain a central meeting place where at the noon hour business men could, in business hours, meet business men for business purposes.

Following the thought expressed in one of the cases (58 F.2d 492) that "no club can exist without having something social in its nature", we find ourselves in touch with many decisions which hold that where the social feature is a mere incidental thing to a club's operations, the club is not taxable as a social club. Cosmos Club v. U. S., Ct.Cl., 42 F.2d 321; Whitehall Lunch Club v. U. S., Ct.Cl., 9 F. Supp. 132; Builders' Club of Chicago v. U. S., Ct.Cl. 58 F.2d 503; Los Angeles City Club v. Welch, D.C., 44 F.2d 239;

Two-Thirty-Three Club v. Welch, D.C., 2 F.Supp. 963.

So regarding, the judgment below is reversed and the cause remanded for due procedure in accordance with this opinion.

BIGGS, Circuit Judge (dissenting).

I am constrained to dissent from the opinion of the majority in the case at bar. My reasons for doing so are as follows:

The learned District Judge found as a fact that the appellant " * * * was a social club as defined by the Revenue laws of the United States." In my opinion this finding was correct and is supported by ample evidence.

Briefly enumerated that evidence is as follows: The appellant was incorporated in 1903, and the incorporators asserted in their petition to the judges of the Court of Common Pleas of Allegheny County, Pennsylvania, that they " * * * associated themselves together for the purpose of social enjoyments * * *" and that the purpose for which the corporation was to be formed was " * * * the maintenance of a club for social enjoyments, in particular, encouraging social intercourse among its members by providing dining facilities, a reading room and place where its members may meet for the discussion of their social and business affairs."

The appellant was incorporated under the laws of Pennsylvania embodied in the Laws of the Session of 1895 (Pennsylvania Laws 1895, pp. 314, 315). The law sets up thirteen classes of non-profit corporations. The sixth class of non-profit corporations thus created is described as "the maintenance of a club for social enjoyments." The eleventh class includes corporations "for the encouragement and protection of trade and commerce." I therefore cannot concur in the ruling of the majority opinion that the appellant at the time of its creation in 1903, if it was in fact a business club or corporation, could not have been incorporated under the eleventh class created by the statute rather than under the sixth class.

The nature and purposes of the appellant were reiterated in a booklet entitled "Roots Thrust Deep", used by it in a membership drive. This booklet states that the appellant " * * * became at once, and has remained, a strong social force; while the variety of interests in its close-knit membership has made it a civic force as

well." The booklet makes numerous other references to the social life of the club and in fact compares it favorably to the Coffee House of Addison's time.

Details of the manner in which the appellant was conducted bear out the finding of the court below. The club served both lunch and dinner to its members. It offered facilities for playing cards; it provided a ladies' dining room. It had a lounge, and a room for pool and billiards. It had lockers for the storage of members' liquor, and it gave an annual New Year's Eve party. Though its membership consisted principally of business men, none the less, it was predominently a social club within the meaning of the applicable statutes and regulations.[1] Its social features, as stated by the court in Fleming v. Reinecke, 7 Cir., 52 F.2d 449, 80 A.L.R. 1293, "* * * were not subordinate or merely incidental to the active furtherance of a different and predominant purpose, but were a material purpose of the organization." See, also, Block Hall v. United States, Ct.Cl., 57 F.2d 918, 924; Army and Navy Club v. United States, Ct.Cl., 53 F.2d 277, 282, certiorari denied 285 U.S. 548, 52 S.Ct. 405, 76 L.Ed. 939; The Lambs v. United States, Ct.Cl., 8 F.Supp. 737; Union League of Chicago v. United States, Ct.Cl., 4 F.Supp. 929.

The learned District Judge in his opinion stated the following: "We are further of the opinion that the plaintiff has waived any right to be considered a non-social club by its claiming itself exemption from income taxes because of the fact that it is a social club. It cannot be a social club to exempt it from one tax and a non-social club to exempt it from another tax."

I cannot find the basis for such waiver or estoppel. The appellant correctly contends that exemption from income tax was properly granted it under the appropriate sections of the applicable Revenue Acts,[2] which provide that clubs organized and operated exclusively for pleasure and other non-profitable purposes, no part of the earnings of which enure to any private shareholder, are exempt from income tax. It is thus apparent that exemption from income tax was granted because the club was formed and operated for non-profit purposes.

The fact remains, however, that upon March 29, 1918, the appellant filed with the Collector of Internal Revenue a claim for exemption from income tax and therein stated that the character and purpose of the appellant was the "* * * maintenance of a club for social enjoyments, in particular, encouraging social intercourse among its members by providing dining facilities, a reading room and a place where its members may meet for the discussion of their social and business affairs", and that the income of the appellant was "* * * used exclusively for the promotion of the purposes for which the said The Union Club of Pittsburgh was organized * * *". It is stipulated that neither the Commissioner of Internal Revenue nor the appellee has required the appellant to file income tax returns or has assessed any income taxes against it throughout the period of eighteen years following the year 1918. It must be inferred from such circumstances that the appellant was not taxed throughout the period referred to because both the appellant and the appellee considered the status of the appellant as a non-taxable to have remained unchanged.

As I have stated previously, though this will not serve as the basis for waiver or estoppel, none the less it affords further evidence, if such is needed, to support the finding of the court below that the appellant is in fact a social club.

The decision of the court below should be affirmed.

---

[1] Revenue Act of 1926, c. 27, 44 Stat. 92, Section 501, 26 U.S.C.A. §§ 950, 951, 952, and the Revenue Act of 1928, c. 852, 45 Stat. 864, Section 413(a), 26 U.S.C.A. §§ 950, 951 and 952; and of Articles 35 and 36 of Treasury Regulations 43.

[2] Section 11 of the Revenue Act of 1916, 39 Stat. 766, Section 231 of the Revenue Acts of 1918, 1921, 1924 and 1926, 40 Stat. 1076, 42 Stat. 253, 43 Stat. 282, 44 Stat. 39, Section 103 of the Revenue Acts of 1928 and 1932, 26 U.S.C.A. § 103, and Section 101 of the Revenue Act of 1934, 26 U.S.C.A. § 103.