The ROCKEFELLER CENTER LUNCH-
EON CLUB, Inc.

v.

James W. JOHNSON, as Collector of In-
ternal Revenue, Third District,
New York.

The ROCKEFELLER CENTER LUNCH-
EON CLUB, Inc.

v.

Joseph T. HIGGINS, as former Collector
of Internal Revenue, Third Dis-
trict, New York.

United States District Court
S. D. New York.

June 1, 1955.

See also 116 F.Supp. 437.

Christy & Perkins, New York City,
Francis T. Christy, New York City, of
counsel, for plaintiff.

J. Edward Lumbard, U. S. Atty., New
York City, Arthur S. Ecker, Asst. U. S.
Atty., New York City, of counsel, for de-
fendants.

BICKS, District Judge.

Plaintiff sues to recover the dues tax-
es collected from, and paid by it on be-
half of, its members for the period
March 1943 to August 1946.[1]

The decision of this case turns upon
the answer to the question: Was the
Rockefeller Center Luncheon Club, Inc.,
a social club or organization within the
meaning of Section 1710 of the Internal
Revenue Code, 26 U.S.C.A. § 1710, dur-
ing the period in respect of which the
dues taxes were paid?

Section 1710 of the Internal Revenue
Code imposes "a tax equivalent to 11 per
centum of any amount paid as dues or
membership fees to any social * * *
club or organization, if the dues or fees
of an active resident annual member are
in excess of $10 per year."

---

1. Powers of attorney from the members of the Club authorizing the Club to file the claim for refund which is the basis of this suit, have been duly filed with the Commissioner of Internal Revenue.

704

The statute does not define what a social club is. There are, however, two relevant Regulations of the Treasury Department which treat with the subject. 26 C.F.R. 101.24 and 101.25,[2] so far as material provide:

101.24 "Determination of character of club.—The purposes and activities of a club or organization and not its name determine its character for the purpose of the tax. Every club or organization having social, * * * features is presumed to be included within the meaning of the phrase, 'any social, * * * club or organization,' until the contrary has been proved, and the burden of proof is upon it."

101.25 "Social clubs.—Any organization which maintains quarters, or arranges periodical dinners or meetings, for the purpose of affording its members an opportunity of congregating for social intercourse, is a 'social * * * club or organization' within the meaning of the Code, unless its social features are not a material purpose of the organization but are subordinate and merely incidental to the active furtherance of a different and predominant purpose, such as, for example, religion, the arts, or business. The tax does not attach to dues or fees of a religious organization, chamber of commerce, commercial club, trade organization, or the like, merely because it has incidental social features, but, if the social features are a material purpose of the organization, it is a 'social * * * club or organization' within the meaning of the Code. * * *"

In passing upon whether plaintiff is a social club the Commissioner of Internal Revenue has demonstrated a fickleness which bespeaks his uncertainty. When the Club was first organized he ruled that it was not a social club. Eight years later he reversed this ruling and instructed the Club in the future to collect the dues tax from its members. Some three and a half years thereafter he suffered a change of mind and ruled once more that the Club was not a social club. This ruling remained in effect for approximately two years when he again reversed himself and ruled that the Club was a social club subject to the dues tax.

Admittedly the operations of the Club, the character of its organization and the purpose for which it was created and, insofar as material for present purposes, the statute and the regulations, underwent no substantial change throughout the entire period. The several changes in the Commissioner's rulings coincided with the rendition of diverse court decisions applying the statute in other cases. It is in the failure to discriminate between varying fact situations and the omission to recognize that for the purpose of determining its character, almost every club is sui generis,[3] that the Commissioner has fallen into error.

The Club was organized on July 9, 1934, under the Membership Corporations Law of New York, McK.Consol. Laws, c. 35. The charter recites that the purpose for which the Club is formed is "to provide and maintain meeting and lunch rooms, and other facilities for the use and convenience of its members, and to conduct and operate a social club * * *." It is the creature of Rockefeller Center, Inc.,[4] the owner of a commercial real estate development which, within the area of a few city blocks, accommodates upwards of 30,000 people during the business day. When the Club

2. These regulations were in effect during 1943 to 1946 and are still in effect.

3. "But when it comes to determining the classification in which a club falls, there has been considerable difference of opinion. The differences are in the main factual. No two clubs are exactly the same. They differ widely in their purposes and practices. Each must be decided on its own facts." Uptown Club of Manhattan v. United States, 1949, 83 F. Supp. 823, at page 829, 113 Ct.Cl. 422.

4. Rockefeller Center, Inc. will hereinafter be referred to as the "Owner".

was organized the only restaurant which afforded comparable facilities was a small restaurant on the ground floor of one of the buildings in the development. Mindful of the deterring influence inadequate restaurant facilities might have upon prospective tenants and with a view to mitigating it, the Owner decided that certain space which was used as a night club, be utilized during specified hours of the day as a restaurant. Owing to the limited seating capacity of that space in relation to the total tenantry, the Owner concluded that some control of access thereto was necessary and that such control could be exercised with least embarrassment to it through the medium of a club. It thereupon proceeded to cause the Rockefeller Center Luncheon Club, Inc. to be organized. The motivation was profit to the Owner, not from the operation of the Club as such, but principally as an added feature to attract tenants to the development.[5]

The Club has only one class of membership—regular resident members. Only adult males are eligible to join. Candidates for membership must be proposed and seconded by two members of the Club and no application is acted upon unless the candidate meets at least two members of the Board of Governors. The only two Governors who testified, stated that they never had voted against an applicant for membership. The members number approximately 1100 and are drawn from various industries and professions. The denominator common to the preponderant number of them is wholly fortuitous—their offices are or were at the time of joining the Club, located in the development.[6] It is not uncommon for tenants to provide membership in the Club and pay the dues for a large number of their partners or executive personnel.[7] When a member who is an executive officer of a corporate tenant dies or retires or leaves the office of the corporate tenant in the development it is the practice to admit to membership without delay a successor designated by the corporate tenant. Sixteen executives and employees of the Owner whose duties relate to tenant relations and to the renting of space in the development are members of the Club and their dues are paid by the Owner.

The Board of Governors consists of nine persons who are tenants or executives of corporate tenants in the development, although there is no requirement in the by-laws to that effect. They are elected by the members of the Club at the annual meeting. Nine members constitute a quorum at such meeting and generally about 15 out of the total membership of 1100 attend. The Board of Governors has no jurisdiction over the furnishing, operation, management, or control of the Club quarters, facilities or services. Their sole function is to pass upon candidates for membership and to make and enforce the by-laws and house rules; for that purpose they meet semimonthly at lunch at the expense of the Owner.

The quarters are located on the sixty-fifth floor of one of the buildings in the development and consist of an entrance lounge, two dining rooms known as the Rainbow Room (seating capacity 231 persons) and the Patio or the Rainbow Grill (seating capacity 156 persons) respectively, a buffet lounge (seating ca-

---

5. See e. g. deposition of I. J. Harvey, Jr.; "* * * We were one of the first tenants to move in the Center, and as I remember that was one of the conveniences and assets that were put forward at the time we moved. We were located downtown."

6. 72% of the members have their offices in the development. A large number of the others were tenants at the time they joined the Club.

7. For instance, a vice-president of the National Broadcasting Company testified that 45 executives of that company and 25 executives of the Radio Corporation of America are members of the Club and that the dues of said members are paid by their respective employers. Other Club members whose offices are in the development testified to like effect.

pacity 86 persons) [8] and two small private dining rooms (seating capacity 18 and 14 persons, respectively). The kitchen and other facilities for the service of food are located on the sixty-fourth floor.

There are two bars in the Club quarters, one solely a service bar where drinks are mixed for service by the waitresses at the dining tables in the Rainbow Room and at tables in the entrance lounge, and the other a combination service and open bar. One side of the latter bar is used to deliver drinks to the waitresses for service at the dining tables in the Rainbow Grill; the other side, where there are six bar stools, opens into the buffet lounge. Members may, if they so desire, order and partake of drinks at the bar or in the buffet lounge regardless of whether they also order or partake of food at the same time.

There is no ladies' dining room. Ladies may have luncheon in the Rainbow Room on weekdays when accompanied by a member. On Saturdays the family of a member may have lunch in the Rainbow Room unaccompanied by a member. Based on the testimony of the members of the Club with respect to the number of times they had lady guests, it would appear that such occasions were infrequent, or even rare, and that when a lady guest was invited it was most often in connection with business.

The Club has no library, no writing room, no billiard room, no game room, no card room, no liquor license, no separate bar room, no assembly hall, no bedrooms, no barbershop, no news stand, no cigar stand, no stock or news ticker, no reciprocal arrangement with any other club, no employees, and no assets or property of any kind. All of the decorations, furnishings, furniture and equipment of the Club were designed and supplied by, and are the property of the Owner, which also maintains and replaces the same at its own expense. The Club never had a lease on the premises or any interest in or connection with the kitchen or other facilities for the service of food or drink.

By agreement between the Owner and the Club the Owner agreed to reserve the quarters occupied by the Club for the exclusive use of the Club during the luncheon period [9] and to provide luncheon service to members of the Club and their guests. The agreement provides further that (i) it shall continue in effect indefinitely, (ii) it may be cancelled at the will of either party by giving not less than eighty days prior written notice, and (iii) as of the date of cancellation, the Club shall cease to have the right to use the words "Rockefeller Center" in connection with its name. It is apparent that the Club is a form set up by the Owner to serve its objectives, that it is within the power of the Owner to cause the activities of the Club to be discontinued, and that realistically the Club continues to exist because the Owner wills it thus.

The Owner contracted with The Union News Company, which operates all but one of the restaurants in the development, to operate the kitchen facilities and provide all the food and drink at the Club and, after Club hours, to the public. All such food and drink comes from the same kitchen and bar facilities and are prepared and served by employees of The Union News Company. The said Company is the licensee for the sale of liquor.

From 1934 to 1942 the rooms on the sixty-fifth floor were open to the public as night clubs under the names "Rainbow Room" and "Rainbow Grill". In December 1942 the night clubs were discontinued and The Union News Company was given the right to use and did use the premises in the afternoons and evenings and on Sundays, for wedding re-

---

**8.** During the period 1936–1949 the buffet lounge was located on the 67th floor. It is not contended, however, that this fact has any material bearing on the issue in this case.

**9.** Since February 1943 the luncheon period has been from 12 noon to 3 P.M.; prior thereto it was from 11 A.M. to 3:30 P.M. The buffet lounge has been and is open for use by members of the Club and their guests until 8 P.M.

ceptions, cocktail parties and dinners for anyone of the public desiring such accommodations. As rent for the premises The Union News Company pays to the Owner a percentage of the proceeds of the food and drink served to members of the Club and the public. Monthly bills for food and drink are sent to the members by The Union News Company and are payable directly to it. It is not possible to allocate the gross receipts as between food and drink served to members of the Club and their guests for the period 1943 to 1946. An analysis of the receipts during April 1953, however, disclosed that $28,901, or 80% of the total, was derived from the sale of food (including guest charges and private dining room charges) and $7,213, or 20%, from the sale of liquor. These figures compare with an average of 78% for food and 22% for liquor in the five public restaurants in the development akin to the Club.[10]

A member may invite guests to accompany him to the Club. Based on a count taken during the month of April 1953, which the parties have stipulated was a typical period, the number of lunches served to guests amounted to 50% of the total served to members. No guest book is kept and members are not required to disclose the names or numbers of their quests. The average daily number of lunches served during weekdays to members of the Club and their guests is about 385 and on Saturdays about 47; the average daily number of members and their guests using the buffet lounge of the Club after 3 P.M. is about 12. There is no evidence in the record as to the number of members who had guests or the number of guests each member had, but the generalization may be fairly drawn that the members availed themselves extensively of the privilege of lunching in the Club with non-mem-

bers and that the non-members or guests were "generally" or "entirely" business as distinguished from social guests.[11]

Since May 1952 the Club has an entrance fee of $100 for new members. Prior to that time no entrance fee was charged. The dues are now $125 per year. The bills for entrance fees and dues are prepared in the name of the Club, sent out, and collected by the comptroller's office of the Owner. The fees and dues are paid over by the Club to the Owner and are included by the Owner in its gross income for income tax purposes.

There is a bank account in the name of the Club through which are cleared all checks received from members for dues, i. e., all dues checks are deposited in the account and then checked out to the Owner, except for an amount sufficient to cover the dues taxes and about $500 which is maintained in the account to keep it alive. All money at any time in this account, except the amount reserved for the payment of dues taxes, belongs to the Owner. The only persons authorized to sign checks on this account are officers and employees of the Owner. The books of account of the Club are kept by the Owner and show only the dues, entrance fees, and taxes thereon received from members and the payment thereof to the Owner and the Director of Internal Revenue respectively. No financial statements or reports of any kind have ever been submitted to the Board of Governors of the Club.

In preparation for the trial of this case the United States Attorney selected at random and, together with an Internal Revenue Agent, interviewed twenty-four members of the Club. Ten of said members gave testimony at the trial. Each of them testified that: after he had joined the Club no one made any effort to

---

10. These restaurants are known as Louis XIV, Mayan, Holland House, French Grill, and English Grill and all are operated by The Union News Company.

11. Each of the Club members who was called as a witness was asked substantial-

ly this question: "And are such guests generally business guests?" Four answered "Yes", one answered, "There were two exceptions," another, "I might have had a few exceptions," and four answered "Entirely".

introduce him to other members, no events were given at the Club for the purpose of making members known to each other, he never received notices from the Club giving the names of applicants for membership, he never had an opportunity to comment favorably or unfavorably upon applicants for membership, he never received notices from the Club giving the names of new members, he never saw a list of the members of the Club, and he never attended an annual meeting of the Club for the purpose of electing governors.

Definition of "social club" whenever judicially attempted has been usually abandoned. In one of the early cases [12] Judge Learned Hand expressed "doubt if it is possible to make any general statement which will not beg the question" and suggested that "perhaps for this reason the decisions have left the test chaotic * * *." In a case relied on by the defendants [13] Judge Goodrich disclaimed any pretense of being able to give "social" a definition which would be self-operative to settle cases other than one in which he was writing and observed that "[T]he term 'social' when used in a statute imposing a tax, necessarily becomes a term of art, even though an elusive one." [14] The problem is not simplified by the attempt at definition in the regulations, to wit; a social club is an organization which maintains facilities "for the purpose of affording its members an opportunity of congregating for social intercourse." [15] In relating "social" to "social intercourse" the meaning of social is hardly clarified. But of this it cannot be gainsaid: as among the members of the Club, inter se, as members, there is no congregating for social intercourse and at least in that regard the Club does not serve a "social purpose". The evidence discloses that members lunch either with non-member guests or with members who are their partners or fellow employees, but there is no evidence that membership in the Club is otherwise availed of as an opportunity for members to meet each other. Witness also, for instance, the complete absence of events or functions at the Club for the purpose of making members known to each other or promoting sociability among them, the lack of any effort whatever to introduce new members to the others, the lack of opportunity for the members generally to comment, favorably or unfavorably, upon applicants for membership, the failure to notify members of the names of those newly admitted or to distribute a list of the members of the Club, and the lack of facilities one usually associates with a social club or with the promotion of social intercourse, such as a library, music room, game room, or a comfortable room in which to indulge in the almost lost art of conversation, or just to relax. The substantial number of guests as compared to the number of members who lunch in the Club, (as indicated supra, meals served to guests amounted to 50% of the total served to members) further evidences either that the Club was not designed to serve a "social" purpose among the members as such, or that it abandoned that purpose. The most that can be said of plaintiff is that it is in the nature of a cooperative organization affording to each of its members the facilities of a private dining room.

Can the plaintiff be said to be a social club because members avail themselves of its facilities to lunch with non-member guests? Clearly, the answer is in the negative. The evidence establishes that the guests, with unimportant exception, were so-called "business guests". The meaning of the term "guest" depends upon the context in which it is used. A friend we invite home to dinner

12. Tidwell v. Anderson, 2 Cir., 1934, 72 F.2d 684, 688.

13. Duquesne Club v. Bell, 3 Cir., 1942, 127 F.2d 363, 143 A.L.R. 1377, certiorari denied 317 U.S. 638, 63 S.Ct. 30, 87 L.Ed. 514, rehearing denied 317 U.S. 706, 63 S.Ct. 152, 87 L.Ed. 563.

14. Id., at page 365, of 127 F.2d.

15. 26 C.F.R. 101.25.

is our guest for the occasion; a customer or prospective customer or person with whom business negotiations of one kind or another are being carried on whom we invite to lunch is our guest; a traveler who presents himself at an inn for board and lodging is referred to as a guest of the innkeeper. The innkeeper's establishment is not a social club because he receives guests nor is a luncheon club a social club merely because guests of the second category are invited. As business affairs are conducted in large metropolitan centers, it is not uncommon to arrange for a luncheon conference or to adjourn a late morning conference to a restaurant, public or private. True, breaking bread together oft-times eases tensions and contributes to greater receptivity, but that does not transform the meeting into a social function.

Can the plaintiff be said to be a social club because members from the same business organization avail themselves of its facilities to lunch together? Again the answer clearly is in the negative. They lunch together not because they are members of the Club, but because they are members of the same business organization and, as one of the witnesses expressed it, "all our key men meet each day for lunch—that is the one time each day we can discuss our problems". Typical of the tenor of the testimony on this score is the following question put to one of the witnesses and his answer thereto: "Is there any particular purpose for lunching with the other members of your organization at the Club?" "Yes, it is a fine opportunity to discuss business matters without interruptions of telephones." Their lunching together at the Club is not associated with the Club. It partakes of no different character than if they lunched together at a public restaurant.

The facilities for the sale and the quantity of liquor sold at the Club establish at most that it is not composed of teetotallers. As set forth supra there is no separate bar room, the bar facilities accommodate but six stools, and the ratio between liquor and food sales was less than the average of the like ratio in the five comparable restaurants in the development. Under the circumstances, the sale of liquor at the Club has no significant bearing on the issue in this case.

That the certificate of incorporation of the plaintiff recites as one of plaintiff's purposes "to conduct and operate a social club" does not necessarily make it a social club and the defendants do not so argue. As 26 C.F.R. 101.24, supra, provides, the purpose and activities of a club, and not its name, determine its character. Likewise, the actual operations of the Club, and not the recitals in the certificate of incorporation, are controlling. Organizations with substantially similar provision in their certificate of incorporation have been held not to be social clubs.[16] Recourse to the recitals in the certificate of incorporation for ascertainment of the character of an organization is appropriate only where its operations and facilities are beclouded in ambiguity or leave doubt as to their purpose.

Until 1942 the cases almost consistently held that true business luncheon clubs were not social clubs.[17] In 1942 the Circuit Court of Appeals for the Third Circuit held that the Duquesne Club of Pittsburgh was a social club,[18] and it

16. Century Club v. United States, 1935, 12 F.Supp. 617, 81 Ct.Cl. 878; Houston Club v. United States, 1932, 58 F.2d 487, 74 Ct.Cl. 640.

For the situation in reverse where organizations operated ostensibly as social clubs were held to be in reality "juntas" see United States of America v. Lebron, 2 Cir., 222 F.2d 531.

17. See e. g., Union Club of Pittsburgh v. Heiner, 3 Cir., 1938, 99 F.2d 259, over-

ruled in Duquesne Club v. Bell, supra, note 13; Whitehall Lunch Club v. United States, 1934, 9 F.Supp. 132, 80 Ct.Cl. 350; Block Hall v. United States, 1932, 57 F.2d 918, 74 Ct.Cl. 600; Bankers Club of America v. United States, 1930, 37 F.2d 982, 69 Ct.Cl. 121; Aldine Club v. United States, 1928, 65 Ct.Cl. 315.

18. Duquesne Club v. Bell, supra, note 13.

was on the basis of that decision that the Commissioner first reversed himself in this case. The Duquesne Club owned, occupied and operated a twelve-story building which contained sixty-five bedrooms, each with a bath, 44 dining rooms, facilities for cards and billiards, a health department with a physician in charge and with facilities for massage, electro therapy and hydro therapy, a barber shop, and library. This abbreviated recital of the physical plant of the Duquesne Club unmistakably establishes its character as that of a social club. Indeed, as will hereinafter appear, the Commissioner of Internal Revenue himself recognized that the Duquesne Club was not analogous to a luncheon club and that he erred when, in reliance on that case, he ruled that plaintiff was a social club. In urging the Duquesne Club case as an authority in support of their position, the defendants overlook that the court expressly recognized its inability to give "social" a definition which would be self-operative to settle other cases and that "the language was manifestly dictum since the social features of that club were so numerous as to make it clearly taxable." [19]

The Commissioner persisted in relying on the dictum in the Duquesne case until 1946 when the Court of Claims handed down its opinion in Merchants Club v. United States,[20] in which, in part, it said, 66 F.Supp. at page 128:

"Based on the language used in that decision [Duquesne case] the Collector of Internal Revenue reversed his previous ruling that the Merchants Club was exempt, and collected the tax which forms the basis of this suit for refund.

"In view of the long line of decisions over a period of years, during which period the ruling of the Collector exempted the plaintiff, and during which period the Congress had not seen fit to change the statute in the light of the decisions and rulings, we do not think the Collector was justified in changing his ruling on the basis of language that was not essential to the decision in the Duquesne case."

The decision in the Merchants Club case apparently persuaded the Commissioner that his previous about face was erroneous, for within four months after it was handed down, he revoked his prior ruling and again held that the plaintiff did not qualify as a social club within the meaning of Section 1710 of the Internal Revenue Code.

The next significant case was Turks Head Club v. Broderick,[21] decided by the Court of Appeals for the First Circuit in 1948. The Court found in that case that the Turks Head Club did not have standing to maintain the suit, since it had failed to procure appropriate powers of attorney from its members. This holding was sufficient to dispose of the case but the Court nevertheless proceeded to consider the merits. After prefacing its discussion with the observation that the "social club" cases turn largely upon their particular facts it reviewed the facts and said:

"* * * when a group of men get together to form a club for the major purpose of furnishing private quarters of attractive outlook where carefully screened congenial spirits, and members of their families and guests, can partake together of food and drink, they have formed a 'social club' * * *"

and further,

"Eating is a universal human necessity. But eating in a select company in such agreeable environment as the Turks Head Club is a luxury. In this way the club has furthered

---

19. Merchants Club v. United States, 1946, 66 F.Supp. 126, 128, 106 Ct.Cl. 562. To the same effect see Uptown Club of Manhattan, Inc., v. United States, 1949, 83 F. Supp. 823, 113 Ct.Cl. 422, certiorari denied 338 U.S. 823, 70 S.Ct. 70, 94 L.Ed. 500.

20. Note 19, supra.

21. 166 F.2d 877, 883.

one of its declared purposes, 'the encouragement of social intercourse.' Certainly the facts in the record indicate that in practice its activities have been directed mainly to this end".

This excerpt is an expression of the conclusion of the court drawn from the particular facts in the case before it. The mischief is that it has been excised from its context and urged as determinative of cases where the facts are materially different. Little imagination is required to recognize that lunching at the Club is not the kind of dining described in the Turks Head case. The degree of selectivity and emphasis on congeniality at the Turks Head Club distinguish it from the plaintiff. In the Turks Head Club, (i) the names of all candidates, with their occupations, addresses and names of their proposers and seconders are required to be conspicuously posted in the club bulletin board for at least fourteen days prior to any action by the Board of Governors; (ii) members are required to register the names of their guests; (iii) a separate room is set apart for the use of ladies; (iv) the ladies of members' immediate households may obtain privilege cards which entitle them "to the same use of and privileges in that part of the Club Rooms set apart for the use of ladies as those to which members are entitled in other parts of the Club Rooms". These features, important as underscoring the social purpose of the Turks Head Club, are completely absent in the plaintiff. Membership in plaintiff, in some instances, as has already been pointed out, is almost automatic. Stress is placed on being a gentleman; congeniality otherwise is not a test or qualification for membership. And, "gentleman" is not narrowly construed or used as a guise to obtain a restricted membership, but rather in contradistinction to one whose conduct would be deemed obnoxious in any restaurant, public or private.

Whatever eroding influence the Merchants Club case had on the dictum in the Duquesne Club case was stemmed and indeed eradicated by the Turks Head Club case. It furnished the basis for the third reversal of the Commissioner's views as to the character of the plaintiff and emblazoned the trial for the cases which followed in the Court of Claims.[22] It is difficult to evolve any general rule from these cases unless it be that each case must be decided on its own facts. What appears to have weighed heavily with the Court of Claims has been the existence of a separate ladies' dining room or the grant of privileges to ladies of members' households, entitling them to have lunch and bring guests when unaccompanied by a member; the existence of a separate bar room or a bar of a size and standard and which produces revenue sufficient to make it a material feature of the Club.

Assuming, arguendo, that the factors which the Court of Claims found persuasive are appropriate criteria, they are absent or present to an unimportant extent in the instant case.

It is not contended that the predominant purpose of the Club is either religion or the arts. The defendants suggest that neither also is it business and that, therefore, the plaintiff is a social club. This argument is fallacious on two grounds: (1) the predominant purpose of the club is business, that is, the furtherance of the business interests of each individual member, albeit all of them are not members of a single industry, (2) the lunching at the Club is for the purpose of promoting such individual business interest.

The defendants contend that the tax on club dues is a "luxury" tax, that lunch-

22. Arkwright Club of City of New York v. United States, 1954, 117 F.Supp. 411, 127. Ct.Cl. 247; Railroad-Machinery Club of N. Y. v. United States, 1951, 95 F.Supp. 822, 118 Ct.Cl. 542; Uptown Club of Manhattan, supra, note 19; Bankers Club of America v. United States, 1949, 87 F.Supp. 253, 115 Ct.Cl. 50; Drug and Chemical Club of New York v. United States, 1949, 115 Ct.Cl. 66, certiorari denied 340 U.S. 810, 71 S. Ct. 37, 95 L.Ed. 595.

ing at the club is a luxury, and therefore, that the tax should attach. Sufficient answer to this contention is that neither the Internal Revenue Code nor the regulations issued thereunder discriminate between an organization housed in luxurious surroundings and one housed less attractively. Surely, it would not be claimed that an admitted social club was exempt from the tax because it occupied humble quarters.

The Court is of the opinion that the Club is not a social club within the meaning of Section 1710 of the Internal Revenue Code. Accordingly, the plaintiff is entitled to judgment in the amount of $21,462.87 with interest, and it is so ordered.