Leo VECELLIO, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Emery TAMPLIN, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Mary Frances TAMPLIN, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Ross IRLE, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Glendale TABOR, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Charles McKINNEY, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Warren A. THORNHILL, III, Plaintiff,
v.
UNITED STATES of America,
Defendant.

Nos. 221–227.

United States District Court
D. West Virginia.
July 15, 1961.

Scherer, Bowers & File, Floyd M. Sayre and Robert J. Ashworth, Beckley, W.Va., for plaintiffs.

Duncan W. Daugherty, U. S. Atty., Huntington, W. Va., for defendant.

FIELD, Chief Judge.

These actions, consolidated for trial without a jury, were instituted by the respective plaintiffs to recover certain excise taxes which they were required to pay under the provisions of § 1710 of the Internal Revenue Code of 1939, 26 U.S. C.A. § 1710, and § 4241 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 4241, which imposes a 20% tax on initiation fees and annual membership dues in excess of $10 paid by members of social, athletic or sporting clubs or organizations. In each of the cases it is agreed that the plaintiffs are residents of the Southern District of West Virginia, have paid the tax and have petitioned for refund, and that procedural requirements for these actions have been duly met. While there are some factual variations in regard to the several actions, the principal question common to all is whether Flat Top Lake Association was a social, athletic or sporting club or organization within the meaning of the statute during the years 1953 to 1956, inclusive. From the evidence which was largely

uncontroverted, I find the following material facts to be true:

(1) Sometime during the year 1949 a group of approximately 100 persons living in the area of Beckley, West Virginia, conceived the idea of constructing a lake and developing a tract of land near Flat Top Mountain in Raleigh County, West Virginia. This group advanced the sum of $25 each, to make the necessary engineering surveys to determine the feasibility of the project. At that time they estimated the cost of land acquisition and construction of the lake at $150,000 and membership was to be limited to 150, each member paying $1,000. The original plan was that each member would receive approximately one acre of land fronting on the lake and extending back therefrom a distance of 300 feet.

A number of difficulties were encountered and it soon became evident that the cost of the project would run considerably more than was originally anticipated. Many landowners in the area were unwilling to sell parcels of only 300 feet around the perimeter of the proposed lake, and, accordingly, it became necessary to purchase entire tracts of land. Instead of an estimated $30,000, the actual cost of the some 2200 acres of land finally acquired was $134,000. The area finally selected and purchased is twelve to fourteen miles from the center of Beckley. In 1957, the population of Beckley was 18,000 and the population of Raleigh County was 96,000 persons.

(2) The Flat Top Lake Association, Inc., was organized under the laws of West Virginia on or about March 31, 1950, as a non-profit corporation and the stated objects in the certificate of incorporation were:

> "To own, control, lease and sell real estate; to build, maintain and operate a lake and other recreational facilities for the pleasure and convenience of its members, without profit, upon a cooperative basis; and to do all other things necessary or incidental to the operation of a recreational and conservation project."

(3) It was necessary to obtain from the Public Service Commission of West Virginia a permit for the construction of the dam, which permit was issued and work begun on July 8, 1950. This work, consisting of the construction of the dam with a concrete core wall, the spillway, clearing of the lakebed, installation of a ten-inch sewer pipe under the lake and dam and a small amount of road work, was completed in 1951 at a cost of approximately $256,000. By November of 1950, the Association had incurred liabilities of some $190,000, and to meet this situation it was decided early in 1951 to reduce the size of the lots and increase the total number thereof to 373, each member being requested to purchase an additional lot for the price of $1,000. Practically all of the charter members complied with this request and the choice of lots was decided by a mass drawing at a membership meeting held in the Raleigh County Court House in March, 1951. The first or "pilot" deed of conveyance, the one to which subsequent deeds referred for covenants, reservations, conditions and restrictions, was executed under date of April 28, 1952.

(4) Under the by-laws, membership in the corporation is limited to those persons over 21 years of age who own in their own name one or more of the lots designated on the plat of land of the Association and who shall have been elected to membership as provided in the by-laws. The wife or husband of a member and their unmarried children under 21 years of age who are living in the home of such member, as well as guests of members, may be admitted to the privileges of the Association subject to certain rules and regulations promulgated by the Board of Directors. No individual can be elected to membership if he has received three negative votes by the Board of Directors. The annual dues of members are fixed by the Board of Directors and shall not exceed $50 per lot, and any unpaid dues become a lien against the lot or lots of a defaulting member. The by-laws provide the procedure for an assessment in any one

year not to exceed the sum of $50 per lot, which likewise becomes a lien against the respective lots in the event of default. Under certain conditions, the membership can levy an assessment not to exceed $100 in any one year, payment of which also is secured by a lien.

(5) Article 8 of the by-laws specifies a number of covenants, reservations, conditions and restrictions to be included in all deeds and in the event of violation of any of such covenants or conditions, title to the lot or lots of such member shall revert to the Association with the provision that the owner may recover the value of the lot together with any improvements thereon. The by-laws further set up a procedure by which membership may be transferred and also provide for descent of the property in the event of the death of a member with certain restrictions upon the property in the hands of his heirs or devisees.

(6) There are presently 303 members owning 372 lots. The Association owns one of the lots as well as holding title to the remainder of approximately 1500 acres of land which was not sub-divided. In addition to the cost of the land and the construction of the lake, it was necessary to expend some $275,000 on access roads serving the lots around the entire perimeter of the lake. The initial cost of this construction was financed by issuing paving certificates in the amount of $260 per lot, which became a lien against the lot in event of default in payment. Later it was necessary to make additional assessments against each lot for the further improvement of the roads.

(7) The Association has no clubhouse facility and the annual dues are devoted for the most part to the maintenance and upkeep of the perimeter road and payment of the salary of a caretaker-supervisor. This caretaker is a Conservator of the Peace appointed by the Sheriff of Raleigh County and paid out of the Treasury of the County, the County being reimbursed the amount of his salary by the Association. This was done pursuant to the provisions of Chapter 6, Article 3, Section 1(b) (1), West Virginia Code, which provides for such appointment upon the petition of any resident or group of residents of any unincorporated community. The Association purchased and owns a patrol boat and certain life saving equipment which is primarily under the control of this supervisor. The gate to the Association property is monitored by the supervisor and only members and their families or authorized guests may be admitted.

(8) An unsightly area in the vicinity of the dam was cleared and sanded and provides a swimming facility for those members whose lots are of such a topographical nature as to make swimming hazardous or unpleasant. The total amount spent on this area was $1,700. There is no lifeguard, nor are any rafts or floats furnished by the Association and a very small percentage of the members resort to the use of this "beach." About 185 members have their own private swimming areas, some with diving towers and boards and sand beaches. Approximately 104 lot owners have built permanent homes around the lake and a number of members live there the year round.

(9) The rules of the Association provide that at no time shall there be group racing competition unless under the supervision of the Boating and Safety Committee. However, in fact, the Association has never permitted any boat race, swimming contest or other organized athletic or sporting activities. Some of the members desired to do some target shooting and, in the interests of safety, the Association bulldozed out an area for that purpose. This area has been used to a very small degree and is now grown up with underbrush. On the occasions when it was used each member supplied his own targets and other equipment. Hunting of waterfowl was permitted the first two years after completion of the lake, but has been prohibited since that time. During one hunting season, the limited hunting of upland game was permitted by the Board but likewise has been prohibited since. Certain individual members of

the Association have stocked fish in the lake on occasions and any member may fish in the lake if he so desires.

(10) Any improvements to the individual lots are paid for by the owners. The Association has made no expenditure for stocking fish, wildlife or game. The Association conducts no social events or gatherings such as dances or picnics, and both the extent and type of social activity of each member depends upon his own desires, discretion and resources.

(11) The Association receives no part of the consideration paid for the conveyance of any lot from one individual to another and makes no charge for such transfer. Since the date of the mass drawing for lots in March, 1951, the prices for lots have steadily increased. On at least one occasion, an individual purchased a lot but did not seek membership in the Association, and thereafter sold the lot at a profit.

(12) The amount which any member paid for his initial lot, whether purchased from the Association or an individual, was treated by the Government as the amount of his initiation fee for tax purposes. The amount paid for any additional lots was not treated as such a fee. However, all annual dues and assessments, including the amounts of the paving certificates were subjected to the tax on dues in spite of the fact that the annual amounts paid by each member on these items depended entirely upon the number of lots owned by him.

The sole issue, of course, is whether Flat Top Lake Association, Inc., was during the years in question a social, athletic or sporting club or organization within the meaning of the indicated sections of the Internal Revenue Code. The Government was not required nor has it undertaken to specify which of the three statutory classifications, or combination thereof, should be applied to the Association. However, concededly, the Association must fall within at least one of the three if the tax is to be upheld.

■ The Treasury Regulations to some degree define those associations and organizations that come within the statutory scope but, of necessity, such definitions are general in nature. In the final analysis, the determination of the status of a club in this context depends upon an appraisal of all of the facts in each particular case. The difficulty involved in such cases was well stated by Judge Goodrich in Duquesne Club v. Bell, 127 F.2d 363, at page 365, 143 A.L.R. 1377:

"The term 'social' when used in a statute imposing a tax, necessarily becomes a term of art, even though an elusive one. While we make no pretense of being able to give it a definition which will be self-operative to settle other cases, we must, nevertheless, determine as best we can whether the facts bring this club within the term used in the statute."

Certainly it would seem that the statutory terms "athletic or sporting" are no less elusive than "social."

■ However, there are some principles that seem to be well established guideposts in this area. First, the actual purpose and activities of a club, and not its name or recitals in its certificate of incorporation, determine its character.[1] "The result must depend upon what was done rather than upon that which was said."[2] Second, it is not necessary that the social or athletic functions be the dominant factor, but these features must constitute a material part of the club's purpose and activities to bring it within the taxing statute; they certainly must be more than incidental.[3] Third, it is

1. Rockefeller Center Luncheon Club v. Johnson, D.C., 131 F.Supp. 703; McIntyre v. United States, D.C., 151 F. Supp. 388; 26 C.F.R. 101.24.

2. Downtown Club of Dallas v. United States, 5 Cir., 240 F.2d 159, 161.

3. Lake of the Forest Club v. United States, 10 Cir., 137 F.2d 843; Army and Navy Club of America v. United States, 53 F.2d 277, 72 Ct.Cl. 684.

not the existence of the facility, but its use that is determinative.[4] Dining facilities have been held to be "social" within the meaning of the statute in some cases;[5] in others the use of such facilities has placed them outside the statutory scope.[6]

It also seems to be well established that if the Association in this case falls within the statutory meaning, the amount paid by any party to obtain the lot which is a condition precedent to membership is subject to the tax as an initiation fee.[7] This would be true regardless of the amount paid or whether the lot was purchased from the Association, another club member or in the open market.[8]

To my mind, however, the parties here were not purchasing lots to obtain membership in a social, athletic or sporting club within the statutory meaning, but, rather, were purchasing lots for their intrinsic property value in what they considered to be a highly desirable real estate development. The social and athletic activities, if any there be, were purely incidental to the cooperative real estate venture. As a matter of fact, I can envision greater opportunities for social contacts or athletic recreation in many of the luxury cooperative apartment ventures in Florida or on our west coast than are present in the instant case.

The evidence here discloses not one instance of social activity resulting from membership in the Association; that is, unless the annual meeting in the Raleigh County Court House could be characterized as a social event. There is no clubhouse, no bar, no lounge; there are no Association cocktail parties, tea dances, dinners or banquets. The social activity among the members is neither more nor less than would be found in any neighborhood or community embracing families of comparable social or financial standing.

The Government has cited the recent case of United States v. McIntyre, 253 F.2d 728, decided in our own Circuit. The social cohesiveness "of a great big family gathering" around the relatively compact and single-purpose confines of the exclusive swimming pool is, to me, a far cry from the heterogeneous activities of some two hundred families scattered along the ten miles of shore line of Flat Top Lake. I find no difficulty whatever in distinguishing this case from those in which the statutory "social" definition has been held appropriate. Nor do I have any difficulty in concluding as a matter of law upon the evidence in this case that Flat Top Lake Association is not a social club or organization within the meaning of the sections of the Internal Revenue Code under consideration.

The remaining question is whether the Association falls within the classification of an athletic or sporting club or organization. This, too, must be answered in the negative. The only possible facility for athletic or sporting activities is the lake itself. There are no organized athletic activities or sporting events such as were found to exist in Block Hall v. United States, 57 F.2d 918, 74 Ct.Cl. 600. There is no lake stocked with fish by the Association, no golf course or swimming equipment, all of which were material factors in Lake of the Forest Club v. United States, 10 Cir., 137 F.2d 843. Indeed there is far less present in this case than confronted Judge Yankwich in Malibu Lakeside Mutual Water Co. v. United States, D.C., 97 F.Supp. 542.

In its brief the Government states that the Association stocked the lake with fish; that a rifle range is presently main-

4. United States v. McIntyre, 4 Cir., 253 F. 2d 728.

5. Downtown Club of Dallas v. United States, supra, note 2. Duquesne Club v. Bell, 127 F.2d 363, 143 A.L.R. 1377; Uptown Club of Manhattan v. United States, 83 F.Supp. 823, 113 Ct.Cl. 422.

6. Rockefeller Center Luncheon Club v. Johnson, supra, note 1.

7. 26 U.S.C.A. § 4242; 26 C.F.R. § 101.28.

8. See Vitter v. United States, 5 Cir., 279 F.2d 445; Munn v. Bowers, 2 Cir., 47 F. 2d 204.

tained and that a herd of deer was propagated by the Association for hunting purposes. There was no evidence to this effect and I find these statements contrary to the facts. The Government further states that the Association has facilities for winter sports, including ice skating and ice fishing. If such facilities exist, they exist through the courtesy of nature during certain seasons of the year, and to no greater degree for the members of the Association than for any other residents of the mountainous regions of West Virginia. It is true the lake was created by artificial means, but other than that the athletic or sporting activities of the Association amount to nothing more than the activities of any individuals residing along meandering streams or natural lakes throughout the country. The Government cites the case of Ship Cabin Club v. Crenshaw, 4 Cir., 199 F.2d 594. That case affirmed a jury verdict that the association of a small group for the purpose of duck shooting was a sporting club within the meaning of the statute. The "common cause" of the group activity in that case was the sporting facility—a vital element that is lacking here. In the present case the lake undoubtedly is the focal point of the community. Its presence contributes immeasurably to the beauty of the surrounding property and the value of the lots. It is true that a number of the members of the Association use the lake for a variety of aquatic activities. However, the evidence in this case clearly indicates that the use of the lake for activities of an athletic or sporting nature within the meaning of the Internal Revenue Code, is not the "common cause" or a material purpose of the Flat Top Lake Association.

■ The Government has placed considerable emphasis upon the use of informational Form 990 by the Association. Whether such form was properly used is not an issue in this case, and the fact that it was used has no operative or probative effect here.[9] The statements made on such form, of course, are to be considered for such evidentiary significance as they may have. However, the aggregate of the evidence in this case clearly preponderates in favor of the plaintiffs, and the statements in the informational return, like those in the certificate of incorporation, must yield to that preponderance.

■ The Government also argues that the covenants, restrictions and limitations upon conveyance set forth in the deeds and by-laws support its position. It is true that all of these elements have evidentiary value in the determination of the status of the Association, but they are not at all conclusive. Once it is determined that the Association does not fall within one of the statutory classifications, the characteristics of the deeds or the restrictions upon property ownership become immaterial. They may very well evidence a cooperative effort on the part of the membership to protect and insure what they consider to be the restrictive integrity of their community, but this does not subject them to the tax. The statute was never intended or designed to reach every cooperative venture, association or organization.[10]

It is my conclusion, based upon the evidence in these cases, that Flat Top Lake Association was not a social, athletic or sporting club or organization within the meaning of the taxing statutes during the years in question, and accordingly, judgment should be entered for the plaintiff in each case. Counsel will prepare appropriate orders incorporating this opinion by reference therein as my findings of fact and conclusions of law.

9. Engineers' Club of Los Angeles v. United States, D.C., 173 F.Supp. 934.

10. "It should be noticed that the statute does not tax clubs generally. Only social, sporting, and athletic clubs are taxed. The issue is not one of exemption from a tax but rather one of the scope of the statute." Tidwell v. Anderson, 2 Cir., 72 F.2d 684, at page 687.